No. 05-142

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 82

_____

STAN JONES, Libertarian Candidate for Governor
and BOB KELLEHER, Green Party Candidate for
Governor,

      Petitioners and Appellants,

   v.

MONTANA UNIVERSITY SYSTEM,

      Defendant and Respondent.

_____

APPEAL FROM:   District Court of the Second Judicial District,
In and for the County of Silver Bow, Cause No. DV 47-2004-223
The Honorable Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

      Robert C. Kelleher, Sr., Attorney at Law, Butte, Montana

      For Respondent:

      James M. Scheier, Agency Legal Services Bureau, Helena, Montana

_____

Submitted on Briefs:  November 9, 2005
Decided:  March 23, 2007

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Stan Jones and Bob Kelleher (Petitioners) appeal from the order of the Second Judicial District Court, Silver Bow County, dismissing their Second Amended Complaint pursuant to Rule 12(b)(6), M.R.Civ.P. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 The present appeal stems from a series of three gubernatorial debates held on public university campuses throughout Montana in September and October 2004. The debate sponsors varied with the debate's location. The Montana Standard, the Butte-Silver Bow Chamber of Commerce, Butte Local Development Corporation, several local radio stations, and Montana Tech sponsored the debate on Montana Tech's Butte campus. The Associated Students of Montana State University (MSU), the Communications and Public Affairs office of MSU, the MSU Leadership Institute, the Wheeler Center, and the Bozeman Chronicle sponsored the debate in Bozeman. Finally, the University of Montana (UM) Alumni Association, the Montana Economic Development Association, and, to a small degree, the UM Political Science Honor Society, sponsored Missoula's debate. The record does not allocate each entity's sponsorship percentage for any of the debates.

¶3 The debates' sponsors did not invite Stan Jones or Bob Kelleher, the Libertarian Party and Green Party candidates for governor in 2004, respectively, to participate in the debates. Petitioners initiated a series of judicial actions before the first debate scheduled for September 21, 2004, seeking injunctive relief to compel their participation in the debates. Petitioners also sought monetary damages to compensate for alleged violations

2

of their civil and constitutional rights.

¶4 Petitioners initiated their attempts to participate in the debates by filing in this Court on September 7, 2004, what they titled a "Rule 17 Motion For Order to Show Cause Why Writ of Mandamus Should Not Be Issued Directing Respondents To Obey Open Meeting Law By Allowing Registered Voters To Quiz, Observe And Evaluate All Four Gubernatorial Candidates While Debating on Sept. 21, 2004 At Montana Tech And Thereafter." We entered an order the following day dismissing Petitioners' motion for failure to provide even an arguable basis for this Court to exercise original jurisdiction.

¶5 Petitioners then filed a document in District Court the following week seeking a temporary restraining order (TRO), hearing, and a jury trial on damages. The original complaint named 18 defendants. On that same day, the Petitioners filed with the District Court a "Mini-Brief on Public Fora." The District Court, then Judge Kurt Krueger presiding, held an *ex parte* hearing on September 16, 2004. The court noted that Petitioners' complaint did not allege irreparable injury or demonstrate likelihood of succeeding on the merits in support of Petitioners' request for immediate injunctive relief. Petitioners also had failed to formally serve any of the 18 defendants named in the complaint. The District Court thus denied Petitioners' requests and ordered Petitioners to serve the defendants properly and allow them sufficient time to respond before it would schedule further hearings in the matter. Judge Krueger recused himself from the matter on September 20, 2004, and Judge John W. Whelan assumed jurisdiction.

¶6 Petitioners amended their request for a TRO and served some parties in accordance with the Montana Rules of Civil Procedure. We note that although

3

Petitioners continued to caption their requests to participate in the debates as requests for a TRO, the District Court, by virtue of requiring Petitioners to provide proper notice to the defendants, subsequently treated the matter as a request for a preliminary injunction. *Compare* § 27-19-315, MCA (allowing a court to grant a restraining order without notice to the adverse party provided specified criteria are met) *to* § 27-19-301(1), MCA (stating that a court may not enter a preliminary injunction without reasonable notice to the adverse party).

¶7     Petitioners filed a First Amended Complaint along with a motion for an order to show cause and for preliminary injunctive relief on September 21, 2004.  The District Court, Judge Nels Swandal having assumed jurisdiction over the matter following the recusals of Judge Whelan and Judge Krueger, issued an order to show cause on September 22, 2004.  The order directed the defendants to appear on September 28, 2004, for a hearing on Petitioners' motion.  Petitioners filed a Second Amended Complaint on September 23, 2004.

¶8     Petitioners' Second Amended Complaint contains a preliminary statement in which they maintain that they initially sought an order to show cause before this Court why the Defendants "should not be ordered to obey Montana's open meeting laws" by allowing the Petitioners to participate in the debates.  The preliminary statement explains that we denied Petitioners' request on the grounds that we could not rule in a "factual vacuum."  Petitioners further allege in this preliminary statement that they "bring this action," presumably the Second Amended Complaint, "to obtain enforcement of federal and state anti-discrimination laws and decisions."  In particular, the preliminary statement

4

cites to a provision of the Government Code of Fair Practices, § 49-3-205(1), MCA, that prohibits the performance of any governmental service with discrimination based upon "political ideas."

¶9 The Second Amended Complaint contains three actual causes of action following this preliminary statement. The first cause alleges that Defendants "have agreed and conspired with the knowledge and consent of each other under color of official right and color of state law within the meaning of 42 USC § 1983 and 1985 and the Voting Rights Act of 1965 to prevent Jones and Kelleher from participating in the debates scheduled for Tuesday, September 21 in the Library of TECH, the theatre of U of M on October 8 and at MSU, Bozeman on October 4." The first cause of action further alleges that "[s]aid conspiracy consists of denying candidates JONES and KELLEHER the right to tell voters gathered in a designated, tax-supported public forum on how to solve" numerous problems facing Montana. After cataloguing these problems, the complaint continues that "VOTERS have a constitutional and statutory right to listen to and observe all four candidates for governor while in the presence of each other and being cross-examined by each other just as a jury has a right to observe witnesses on the witness stand after being sworn to tell the truth."

¶10 Petitioners purport to bring the second cause of action on behalf of "91,989 unregistered Montana minors [MINORS] including 77,943 school children . . . and 14,046 pre-schoolers [25.6% of 54,869], a Class." The second cause of action alleges that these 91,989 unregistered minors must rely upon their parents becoming educated "about the four – not two – candidates" for governor. The third cause of action, titled

5

"Kelleher's Cause of Action," challenges the accuracy of an editorial published in the Montana Standard that claimed that Petitioner Kelleher had "never topped 5 percent" in all of the elections in which he has been a candidate.

¶11    The District Court held a hearing on September 28, 2004, that addressed Petitioners' request for a preliminary injunction and received one exhibit.  Petitioner Kelleher testified at the hearing.  The defendants presented as witnesses Bill Johnston, the alumni director for UM, and Jodie DeLay, a program coordinator in the Office of Communications and Public Affairs at MSU.  The District Court denied Petitioners' request for injunctive relief based on their failure to demonstrate either irreparable harm or a likelihood of succeeding on the merits.  The District Court issued this order on October 4, 2004.  Petitioners did not appeal.

¶12    All remaining defendants then filed motions to dismiss pursuant to Rule 12(b)(6), M.R.Civ.P.  The District Court dismissed Petitioners' Second Amended Complaint, and ordered the file closed on December 21, 2004.   Petitioners filed a motion for reconsideration and various defendants responded.  The District Court denied the motion on January 12, 2005.  Petitioners' notice of appeal filed on January 31, 2005, stated that they appealed from the District Court's order denying their Motion for Reconsideration.

¶13    The Montana Rules of Civil Procedure do not recognize, however, a Motion for Reconsideration.  *See Nelson v. Driscoll*, 285 Mont. 355, 359, 948 P.2d 256, 258 (1997).  The District Court's order denying Petitioners' Motion for Reconsideration acknowledged Petitioners' procedural misstep.  The court's order also recognized that even if the court considered Petitioners' motion as one to alter or amend the judgment (as

6

permitted under Rule 59(g), M.R.Civ.P.), Petitioners had failed to bring any new information or cite any new law for the court to consider.

¶14 Although Petitioners appealed from an order in response to a motion not authorized under the Montana Rules of Civil Procedure, Petitioners filed the notice of appeal within the 60-day time limit from the notice of entry of judgment of the court's first order dismissing the Second Amended Complaint. Rule 5(a)(1), M.R.App.P. Thus, we will accommodate Petitioners' appeal in this instance as though they had appealed from the District Court's dismissal of their Second Amended Complaint.

## STANDARD OF REVIEW

¶15 We construe the complaint in the light most favorable to the plaintiffs when reviewing an order dismissing a complaint under Rule 12(b)(6), M.R.Civ.P. *Plouffe v. State*, 2003 MT 62, ¶ 8, 314 Mont. 413, ¶ 8, 66 P.3d 316, ¶ 8. A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Plouffe*, ¶ 8. The district court's determination that a complaint failed to state a claim is a conclusion of law. *Plouffe*, ¶ 8. We review the district court's conclusions of law to determine whether they are correct. *Plouffe*, ¶ 8.

¶16 The Dissent surmises that the District Court may have considered testimony from the September 28, 2004, hearing on the Petitioners' motion for preliminary injunctive relief in ultimately dismissing the Petitioners' Second Amended Complaint. The Dissent suggests that this potential consideration by the District Court transformed the Montana University System's motion to dismiss pursuant to Rule 12(b)(6), M.R.Civ.P., to a

7

motion for summary judgment pursuant to Rule 56, M.R.Civ.P. ¶ 104. The Dissent fails to cite to any statement or reference in the District Court's order of October 4, 2004, however, that would support its conjecture.

¶17 Moreover, when a district court converts a motion to dismiss to a motion for summary judgment, as contemplated by Rule 12(b), M.R.Civ.P., the court must provide notice to the parties of its intention to do so. *Hoveland v. Petaja*, 252 Mont. 268, 271, 828 P.2d 392, 393 (1992); *State ex rel. Dept. of H.& E.S. v. City of Livingston*, 169 Mont. 431, 436, 548 P.2d 155, 157 (1976). "The purpose of notice is to allow the parties a reasonable opportunity to present all material made pertinent to the motion and avoid surprise." *Hoveland*, 252 Mont. at 271, 828 P.2d at 393-94. Nothing in the record indicates that the District Court provided notice to the parties of its intent to convert the Montana University System's motion to dismiss into a motion for summary judgment. We will not assume that the District Court converted the motion to dismiss into a motion for summary judgment absent such notice and absent any claim by the Petitioners of such a conversion. Accordingly, we will review the District Court's conclusions of law to determine whether they are correct. *Plouffe*, ¶ 8.

## DISCUSSION

¶18 Did the District Court properly dismiss Petitioners' Second Amended Complaint?

¶19 In light of the unclear briefing and complicated procedural posture of this case, we deem it necessary to establish the context of this appeal before we address its merits.

¶20 The Respondent on appeal.

¶21 Petitioners' Second Amended Complaint names 22 defendants. Petitioners failed

8

to serve briefs on 21 defendants as required by Rules 20(b) and 26(b), M.R.App.P. We address only those claims asserted against Montana University System as the sole Respondent whom Petitioners served on appeal.

¶22    The issues on appeal.

¶23    Petitioners' brief on appeal includes numerous issues not raised in the District Court. We will not review issues raised for the first time on appeal. *Bekkedahl v. McKittrick*, 2002 MT 250, ¶¶ 31-32, 312 Mont. 156, ¶¶ 31-32, 58 P.3d 175, ¶¶ 31-32. We limit our review to those issues Petitioners raised in the District Court. *Bekkedahl*, ¶ 32.

¶24    The District Court's order analyzed briefly whether the gubernatorial debates were public forums. This issue only arose, however, in the context of Petitioners' request for injunctive relief. The District Court issued an order denying that request on October 5, 2004. Rule 1(b)(2), M.R.App.P., provides that a party may appeal an order "refusing to grant or dissolve an injunction." Rule 2(a), M.R.App.P., provides that this Court may review the decision and any intermediate order or decision objected to properly that involves the merits or necessarily affects the judgment "*except* a decision or order from which an appeal might have been taken." (Emphasis added). Petitioners' failure to appeal the District Court's order denying injunctive relief—an appealable order listed under Rule 1(b)(2), M.R.App.P.—consequently deprives this Court of the authority to address it now. Rule 2(a), M.R.App.P.; *See also Little Horn State Bank of Wyola v. Gross*, 89 Mont. 472, 476, 300 P. 277, 278-79 (1931); *DeLaurentis v. Vainio*, 169 Mont. 520, 524, 549 P.2d 461, 464 (1976).

¶25    Petitioners' Second Amended Complaint.

¶26    Petitioners' Second Amended Complaint includes headings for three causes of action.  Petitioners did not pursue on appeal a review of the District Court's dismissal of their third claim, known as the "Kelleher Claim," in which Petitioners took issue with the accuracy of a newspaper editorial that claimed that Kelleher never had received more than five percent of the vote in any election in which he had run as a candidate.  We review the remaining two claims in turn.

¶27    The "first cause of action" in Petitioners' Second Amended Complaint alleges that the defendants "have agreed and conspired with the knowledge and consent of each other under color of official right and color of state law within the meaning of 42 USC § 1983 and 1985 and the Voting Rights Act of 1965 to prevent Jones and Kelleher from participating in the debates. . . ."  Petitioners further allege that the "conspiracy consists of denying candidates JONES and KELLEHER the right to tell voters gathered" in a public debate how to solve Montana's problems.  The "first cause of action" arguably also incorporates the Government Code of Fair Practices, § 49-3-205(1), MCA, referenced in the preliminary statement, that prohibits the performance of any governmental service with discrimination based upon "political ideas."  We address these assertions in turn, and, in harmony with our policy to interpret the pleadings liberally, *Ryan v. City of Bozeman*, 279 Mont. 507, 513, 928 P.2d 228, 232 (1996).  We also address a common law conspiracy claim as the District Court discussed.

¶28    A.    Did Petitioners state a claim under 42 U.S.C. § 1983 against Montana University System?

10

¶29  Petitioners' Second Amended Complaint provides scant analysis and facts regarding their § 1983 claim.  In fact, the Second Amended Complaint only mentions § 1983 in the single sentence quoted at ¶ 27 above with respect to the alleged conspiracy. Arguably the sole reference to § 1983 could be interpreted as being limited to the "under color of official right and color of state law" clause in an effort to establish an element of conspiracy claim under 42 U.S.C. § 1985.  In line with our policy to interpret pleadings liberally, however, we will analyze whether Petitioners have alleged a separate stand-alone claim under § 1983.  *Ryan*, 279 Mont. at 513, 928 P.2d at 232.

¶30  The Second Amended Complaint's introduction declares that Petitioners brought the action "to obtain enforcement of federal and state antidiscrimination laws and decisions."  The preliminary statement fails to identify those federal laws and decisions that might be relevant to Petitioners' claim.  The remainder of the Second Amended Complaint also fails to identify the federal antidiscrimination laws and decisions that may be relevant.  The preliminary statement in the Second Amended Complaint also cites § 49-3-205(1), MCA, and alleges that the defendants discriminated against Petitioners based on their political ideas.  Thus, it appears that the spirit of Petitioners' § 1983 claim rests on allegations of political discrimination.

¶31  Discrimination under federal law.

¶32  Section 1983 provides that every person acting under color of state law who deprives a citizen "of any rights, privileges, or immunities secured by the Constitution and laws" shall be liable to the injured party.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere

11

conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870 (1989). The first step in evaluating a § 1983 claim is to identify, therefore, the specific federal constitutional or statutory right allegedly infringed. *Graham*, 490 U.S. at 394, 109 S. Ct. at 1870.

¶33 A careful scouring of Petitioners' Second Amended Complaint reveals alleged violations of nary a substantive right guaranteed by the U.S. Constitution or a federal statute. In fact, Petitioners identify the following provisions of the Montana Constitution or Montana law as being relevant to their claims: Article II, Sections 1, 2, 3, 4, 6, 7, 8, and 9, of the Montana Constitution, and § 13-35-213, MCA. The complaint elsewhere mentions our decision in *Common Cause v. Statutory Committee*, 263 Mont. 324, 868 P.2d 604 (1994), § 2-3-101, MCA, and § 2-3-201, MCA, although Petitioners leave their relevancy to the reader to ascertain.

¶34 Federal law recognizes claims of political discrimination in the context of deprivation of a property interest. This property interest generally takes the form of government employment. *See e.g. Elrod v. Burns*, 427 U.S. 347, 372-73, 96 S. Ct. 2673, 2689 (1976) (holding that it is unconstitutional for public agencies to discharge employees who are neither policymaking nor advisory based on their political affiliations, reasoning that an employee's exercise of First Amendment rights outweighs the government's interest in maintaining a system of political patronage); *Branti v. Finkel*, 445 U.S. 507, 514-15, 100 S. Ct. 1287, 1292-93 (1980) (same). The Supreme Court expanded upon *Elrod* and *Branti* in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75, 110 S. Ct. 2729, 2737 (1990), where it held that the government may not base

12

promotions, transfers, recalls, and other hiring decisions involving public employees on party affiliation and support unless the government can show that party affiliation is an appropriate requirement for the position involved.

¶35 Petitioners do not allege any employment related claims of political discrimination. We can find no cases, and the Petitioners have failed to identify any cases, however, that support the proposition that a party can vindicate a claim of political discrimination outside the employment context through an action brought pursuant to § 1983.

¶36 The Petitioners, as appellants, bear the burden of establishing error by the court; such error cannot be established in the absence of legal authority. *State v. Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, ¶ 26, 87 P.3d 1032, ¶ 26. The Petitioners' failure to establish error leads us to conclude that the District Court correctly dismissed any claim by Petitioners' of discrimination under federal law. The District Court, of course, reached its conclusion based on its analysis of the public forum doctrine. It is well settled that if we reach the same conclusion as the district court, but on different grounds, we nonetheless may affirm the district court's judgment. *Safeco Ins. Co. of America v. Liss*, 2000 MT 380, ¶ 25, 303 Mont. 519, ¶ 25, 16 P.3d 399, ¶ 25.

Discrimination under state law.

¶37 Absent any basis in federal law to support its claim of political discrimination under § 1983, we turn then to Petitioners' claims of political discrimination based on Montana law. Petitioners cite § 49-3-205(1), MCA, at several points in their Second Amended Complaint. This statute prohibits discrimination based upon "political ideas"

13

in the performance of any governmental services. Petitioners seem to allege that the Montana University System provides governmental services in the form of hosting political debates within public buildings. Petitioners appear to allege that the Montana University System has violated § 49-3-205(1), MCA, by refusing to allow Petitioners to participate in the political debates held within these public buildings and thereby discriminating against Petitioners based upon their political ideas. The Montana University System argues that the Montana Human Rights Commission provides the proper forum for Petitioners to vindicate their state law discrimination claims. We agree.

¶38    Section 49-2-509(7), MCA, provides in pertinent part:

> [t]he provisions of this chapter establish the exclusive remedy for acts constituting *an alleged violation of chapter 3* or this chapter, including acts that may otherwise also constitute a violation of the discrimination provisions of Article II, section 4, of the Montana constitution or 49-1-102. (Emphasis added).

The statute requires Petitioners to file a formal complaint with the Montana Human Rights Commission (MHRC) alleging a violation of Chapter 3 of Title 49 of the Montana Code Annotated before they can proceed with a discrimination claim in district court. Sections 49-2-509(7), 49-2-501, MCA. Section 49-3-205(1), MCA, can be found in Chapter 3 of Title 49. In light of Petitioners' failure to file a complaint with the MHRC, we conclude that the District Court properly granted Defendant's motion to dismiss Petitioners' state law discrimination claim. *See Dupuis v. Board of Trustees*, 2006 MT 3, ¶¶ 17-19, 330 Mont. 232, ¶¶ 17-19, 128 P.3d 1010, ¶¶ 17-19. We earlier had affirmed a district court's order dismissing plaintiffs' § 1983 claims in *Shields v. Helena School Dist. No. 1,* 284 Mont. 138, 149-50, 943 P.2d 999, 1005-06 (1997), where discrimination

14

formed the gravamen of the amended complaint brought under § 1983 and the Individuals with Disabilities Education Act and the plaintiffs had failed to exhaust available administrative procedures under the MHRA.

¶39   A party normally need not exhaust available state administrative remedies before seeking to vindicate a federal constitutional or statutory right through a § 1983 action filed in federal or state court. *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 500-16, 102 S. Ct. 2557, 2559-68 (1982).  Here, however, Petitioners have failed to present a viable claim of political discrimination under federal law that they can vindicate pursuant to § 1983.  At best, Petitioners have alleged a claimed violation of the antidiscrimination provisions contained in § 49-3-205(1), MCA, or violations of various provisions of the Montana Constitution.  Petitioners first must exhaust available administrative remedies before pursuing a state law discrimination claim in district court.  Section 49-2-509(7), MCA.  Petitioners' failure to exhaust available administrative remedies precludes them from bringing a viable claim in district court.

¶40   B.  Did Petitioners state a claim under 42 U.S.C. § 1985, the Voting Rights Act of 1965, or a common law conspiracy claim against Montana University System?

¶41   Petitioners supplemented the conspiracy claim statement quoted in ¶ 27 above by stating that the "conspiracy consists of denying candidates JONES and KELLEHER the right to tell voters gathered" in a public debate how to solve Montana's problems.  The Second Amended Complaint does not develop further any of the conspiracy claims.

¶42   The plaintiff carries the burden to plead adequately a cause of action. *Maney v. Louisiana Pacific Corp.*, 2000 MT 366, ¶ 28, 303 Mont. 398, ¶ 28, 15 P.3d 962, ¶ 28.

15

Although we construe pleadings liberally, we have said that "a complaint must state something more than facts which, at the most, would breed only a suspicion that plaintiffs have a right to relief. Liberality does not go so far as to excuse omission of that which is material and necessary in order to entitle relief." *Maney*, ¶ 28.

¶43 To prove a conspiracy claim under 42 U.S.C. § 1985, a plaintiff must show that some "'racial, or perhaps otherwise class-based, invidiously discriminatory animus'" lay behind the conspirators' action and that the conspiracy was aimed at interfering with plaintiff's private and publicly protected rights. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 113 S. Ct. 753, 758 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 (1971)).

¶44 A common law conspiracy occurs in Montana when a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. *Schumacker v. Meridian Oil Co.*, 1998 MT 79, ¶ 18, 288 Mont. 217, ¶ 18, 956 P.2d 1370, ¶ 18. We also have established that it is not the conspiracy itself, but the torts committed or the wrong done in furtherance of the conspiracy that give rise to a conspiracy claim. *Schumacker*, ¶ 18.

¶45 Petitioners' Second Amended Complaint omits that which is material and necessary to demonstrate that they are entitled to relief. The Second Amended Complaint fails to allege that Petitioners are members of a suspect class in support of a § 1985 claim. The Second Amended Complaint similarly fails to make any allegations that the Montana University System conspired for an illegal purpose. Finally, the Second Amended Complaint is void of any facts whatsoever that would sustain a claim under the Voting

16

Rights Act of 1965. The sole reference to the Act appears in the sentence quoted in ¶ 27 above.

¶46 Even when viewed in the light most favorable to Petitioners, the asserted facts would, at most, breed only a suspicion that Petitioners may have a right to relief. Thus, we affirm the District Court's decision to grant Montana University System's motion under Rule 12(b)(6), M.R.Civ.P., for failure to state a claim under 42 U.S.C. § 1985, the Voting Rights Act of 1965, and common law conspiracy.

¶47 C. Whether Petitioners Have Standing to Bring a Claim on Behalf of "91,989 Montana Hungry Unregistered Minors."

¶48 Petitioners purport to bring the "second cause of action" on behalf of "91,989 Montana hungry unregistered minors." Standing represents a "'threshold requirement of every case.'" *Armstrong v. State*, 1999 MT 261, ¶ 4, 296 Mont. 361, ¶ 4, 989 P.2d 364, ¶ 4 (quoting *Matter of Paternity of Vainio*, 284 Mont. 229, 235, 943 P.2d 1282, 1286 (1997)). Consequently, parties cannot waive objections to standing and this Court may address the standing requirement *sua sponte*. *Armstrong*, ¶ 4. A party must demonstrate a personal stake in the outcome of the controversy and some injury that would be alleviated successfully by maintaining the action to satisfy the standing requirement. *In re B.F.*, 2004 MT 61, ¶ 15, 320 Mont. 261, ¶ 15, 87 P.3d 427, ¶ 15. We have applied the general rule regarding standing that "a litigant may only assert his own constitutional rights or immunities." *In re B.F.*, ¶ 16; s*ee also* 16 C.J.S. *Constitutional Law* § 114 (2005).

17

¶49 We note that the alleged "hungry minors" possess neither a stake in the outcome of Petitioners' Second Amended Complaint alleging various civil rights violations nor have suffered any injury that Petitioners' Second Amended Complaint would alleviate. And by their very designation of being "unregistered" to vote, minors had no stake in the outcome of Petitioners' requests for injunctive relief. Further, our general rule prohibiting a third party from asserting constitutional rights on behalf of others forbids Petitioners from acting on the minors' behalf in this instance. *In re B.F*., ¶ 16.

¶50 In light of the fact that "91,989 Montana hungry unregistered minors" lack standing, and that Petitioners cannot assert an action on their behalf, we order "91,989 Montana hungry unregistered minors" stricken from the caption in this case. We conclude that the District Court properly dismissed the portion of Petitioners' Second Amended Complaint designated as "second cause of action" based upon the Petitioners' lack of standing to assert the constitutional rights of others. *See Fleenor v. Darby School District*, 2006 MT 31, 331 Mont. 124, 128 P.3d 1048 (affirming the district court's dismissal of complaint because plaintiff lacked standing).

¶51 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JOHN WARNER

18

Justice Jim Rice concurs.

¶52    I concur in the Court's decision.  In my view, the Court has been extremely generous in the effort it has made to take up the issues raised on appeal.  More than poorly written, the appellate briefing on behalf of "91,989 Montana Hungry Unregistered Minors" is filled with irrelevant extraneous information and is nonsensical.  Dismissal of the entire appeal for inadequate briefing pursuant to M. R. App. P. 23(b)(4) would also be an appropriate resolution of this matter.

                                        /S/ JIM RICE

Justice Patricia O. Cotter concurs.

¶53 I concur with Justice Nelson's observation that we err by ignoring the fact that Kelleher and Jones presented a cognizable First Amendment claim that was recognized and addressed as such by the District Court. Further, I concur with Justice Nelson's conclusion that the District Court was correct in concluding that the University System debates were nonpublic fora. *See* Dissent, ¶¶ 91, 96. However, in my judgment, the District Court did not err in ultimately concluding that Kelleher and Jones's exclusion from the debates was both viewpoint neutral and reasonable.

¶54 I will not rehash here the arguments of the Court and the Dissent regarding the District Court's apparent conversion of the University System's motion to dismiss to a motion for summary judgment. I agree that such a conversion appears to have been accomplished, and inappropriately so, without notice. However, in their appeal Kelleher and Jones do not object to this "procedural irregularity," as we termed it in *Plouffe,* ¶ 18. Plouffe was a *pro se* claimant like Kelleher and Jones are here, yet we took pains to note that on appeal, he argued that the district court erred in making the conversion from motion to dismiss to motion for summary judgment, and we therefore concluded he had not acquiesced in the court's actions in that regard. *Plouffe*, ¶¶ 18-19. Likewise, in *Hoveland v. Petaja*, 252 Mont. at 269, 828 P.2d at 393, plaintiffs' issue on appeal was whether the district court erred in converting a motion to dismiss into a motion for summary judgment. The same is not true here.

¶55 Notwithstanding Kelleher and Jones's failure to preserve this erroneous conversion for appeal, I would conclude that ultimately, the District Court did not err in

20

dismissing (or in effect granting summary judgment upon) their Second Amended Complaint. Kelleher and Jones's allegation that their exclusion was unreasonable and/or not viewpoint neutral is not an assertion of fact, but rather is a conclusory denial of the University System's assertions to the contrary. I do not believe that a mere allegation of contrariness of intent is or should be sufficient to defeat a motion for summary judgment, or for that matter a motion to dismiss, when the motion is, as is the case here, well-supported both factually and legally. *See* Dissent, ¶ 135. As the Dissent points out, we apply in the nonpublic fora cases a limited review: The government need only demonstrate that its restrictions are reasonable and viewpoint neutral. Dissent, ¶ 82. In my judgment, the University System squarely met this burden, and Kelleher and Jones did not overcome it. Therefore, while I do not concur in the rationale relied upon by this Court for its decision to affirm the District Court, I concur in the result.

/S/ PATRICIA COTTER

Justice James C. Nelson, dissenting.

¶56 I dissent from the Court's decision. The Court evades the central issue of this case by analyzing the allegations set forth in Kelleher and Jones's Second Amended Complaint in a mechanical and hypertechnical manner, contrary to our liberal pleading rules. As a result, the Court's Opinion fails to address the substance of Kelleher and Jones's primary allegations. For the reasons which follow, Kelleher and Jones stated a cognizable claim under the First Amendment, the District Court erroneously dismissed that claim, and the claim is now properly before us on appeal. I therefore would reverse the District Court's judgment and remand this case for further proceedings.

## I. Background

¶57 Three public debates were held on campuses of the Montana University System ("University System") in conjunction with the 2004 gubernatorial election. The first debate took place on September 21, 2004, in the Library Auditorium at Montana Tech of the University of Montana in Butte ("Montana Tech"), the second on October 4, 2004, in the Strand Union Building Ballrooms at Montana State University in Bozeman ("MSU"), and the third on October 8, 2004, in the Performing Arts and Radio/Television Center at the University of Montana in Missoula ("UM"). Each debate was cosponsored by the University System—at least to the extent that the debates were held on the University System's campuses—as well as various local organizations (*see* Opinion, ¶ 2).

¶58 On August 21, 2004, the *Montana Standard* ran a notice announcing that "[t]he two contenders for the governor's office will face off in a public forum at Montana Tech at 7 p.m. Tuesday, Sept. 21" and soliciting questions from the public to be posed to the

22

candidates. Contrary to the foregoing quoted statement, however, there were more than two contenders for the governor's office. In fact, four gubernatorial candidates had been certified by the Montana Secretary of State: Brian Schweitzer, the Democratic Party candidate; Bob Brown, the Republican Party candidate; Jones, the Libertarian Party candidate; and Kelleher, the Green Party candidate. However, only Schweitzer and Brown were invited to participate in the debates. Indeed, Kelleher and Jones allege that they were "uninvited" and "denied" the opportunity to participate. For instance, on September 10, 2004, Jones inquired of the MSU debate organizers whether he was going to be invited to participate in the gubernatorial debate there on October 4. He was informed that "the [planning] committee's decision at that point was that he was not, nor was Mr. Kelleher going to be invited." Likewise, in response to a fax sent by Kelleher to the MSU debate organizers on or about September 20 asking if they were going to invite him to the debate, he was informed by telephone that "the committee's decision was that he would not be invited." And on September 21 (the date of the debate at Montana Tech), Kelleher and Jones allegedly were told that they "were not welcome at the university facility."

¶59 As a result of their exclusions from the debates, Kelleher and Jones initiated proceedings in the District Court seeking injunctive relief—specifically, that they be allowed to participate in the three debates. Ultimately, the District Court denied their request for a temporary restraining order on September 16, 2004, denied their request for a preliminary injunction on October 4, 2004, and dismissed their complaint on December 21, 2004, pursuant to the University System's motion to dismiss under M. R. Civ. P.

23

12(b)(6) for failure to state a claim upon which relief can be granted. This appeal followed.

## II. Whether Kelleher and Jones Stated a Cognizable First Amendment Claim

### A. This Court's Remaking of Kelleher and Jones's Pleadings

¶60 This case is, at its core, about one subject: free speech. Granted, in their filings in the District Court and in their briefing on appeal to this Court, Kelleher and Jones mire the relevant in a mélange of extraneous information, including obscure statistics, inapt theories of relief, and immaterial expositions on "[t]he plight of the underemployed and the serious health, education and transportation problems of Montana." However, it is important to keep in mind that under our standard of review with respect to motions to dismiss, as the Court acknowledges at ¶ 15, we construe a complaint "in the light most favorable to the plaintiffs" (citing *Plouffe v. State*, 2003 MT 62, ¶ 8, 314 Mont. 413, ¶ 8, 66 P.3d 316, ¶ 8). Furthermore, "[i]t is always to be presumed that no absurd or unreasonable result was intended by the complainant." *Hidden Hollow Ranch v. Collins*, 146 Mont. 321, 326, 406 P.2d 365, 367-68 (1965). Finally, and most importantly, we "look to the claim as a whole, to the subject with which it deals, to the reason and spirit of the allegations in ascertaining its real purpose. If such purpose can reasonably be said to be within the scope of the language used, that purpose should be honored." *School Trust v. State ex rel. Bd. of Com'rs*, 1999 MT 263, ¶ 29, 296 Mont. 402, ¶ 29, 989 P.2d 800, ¶ 29 (internal quotation marks omitted).

¶61 Given these standards, and notwithstanding Kelleher and Jones's less-than-artful presentation, it is evident that the alleged unconstitutional deprivation of their rights to

24

speak in the three gubernatorial debates at Montana Tech, MSU, and UM in September and October 2004 is at the very heart of their complaint. Indeed, Kelleher and Jones asserted in their original Petition for Order to Show Cause, TRO & Complaint—and they reiterated in the two subsequent amended versions of this document—that they were being unlawfully excluded from participating and presenting their political views in the debates. That they were raising a constitutional free speech claim is further confirmed by the fact that one day after filing their original complaint, they filed a supplemental brief titled "Mini-Brief on *Public Fora* Petition for Order to Show Cause, TRO & Complaint," in which they alerted the District Court to the "Status of U.S. Supreme Court Views on non-public fora." Specifically, relying on *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 118 S.Ct. 1633 (1998)—a case in which the United States Supreme Court analyzed a First Amendment claim in a factual context quite similar to the case at hand— they argued that the defendants could not "show a compelling state interest in prohibiting two of 4 gubernatorial candidates from participating in the Sept. 21 date [sic] at Montana Tech." (They incorporated this same argument into subsequent filings and added references to the October 2004 debates at MSU and UM.[1])

---

[1] Incidentally, the original Complaint was filed September 15, 2004, the First Amended Complaint was filed September 21, 2004, and the Second Amended Complaint was filed September 23, 2004. Although the Montana Tech debate was held September 21, the injunctive relief requested in the Second Amended Complaint was still timely with respect to the October 4 debate at MSU and the October 8 debate at UM. Moreover, the free speech issues Kelleher and Jones raised are capable of repetition yet evading review, thus making them appropriate for our review pursuant to our decision in *Walker v. State*, 2003 MT 134, ¶¶ 38-45, 316 Mont. 103, ¶¶ 38-45, 68 P.3d 872, ¶¶ 38-45.

25

¶62 Fully recognizing the substance of Kelleher and Jones's claims, the University System asserted in its Brief Opposing Preliminary Injunction as follows: "The United States Supreme Court case of [*Forbes*] is *dispositive of the issues raised by Plaintiffs*" (emphasis added). The University System then proceeded with a detailed, 3½-page discussion and application of *Forbes* to the debates at issue here, citing four other First Amendment precedents in the process and concluding ultimately that the exclusion of Kelleher and Jones from the debates was constitutional.

¶63 Later, in its brief in support of its motion to dismiss the Second Amended Complaint, the University System again relied on *Forbes*, asserting as its first contention that "THE DECISION OF THE UNITED STATES SUPREME COURT IN [*FORBES*] REQUIRES DISMISSAL OF THE COMPLAINT." As before, the University System argued, in some detail, that "[t]he case here is factually similar to *Forbes*," that the debates were nonpublic fora, and that the exclusion of Kelleher and Jones was "reasonable" and not based on their viewpoints. The University System concluded that, "[p]ursuant to *Forbes*," the complaint should be dismissed. It reiterated this position in its reply brief in support of its motion to dismiss, asserting that "the holding [of *Forbes*] resolves the primary issue in this case."

¶64 And the University System was not the only one in the lower court proceedings to recognize that Kelleher and Jones had raised a First Amendment claim. Several of the other named defendants (specifically, Attorney General Mike McGrath, Secretary of State Bob Brown, and Commissioner of Political Practices Linda Vaughey, who have since been dismissed from the case) acknowledged such a claim in their motion to

26

dismiss, and the District Court itself twice ruled on the claim. In denying Kelleher and Jones's request for a preliminary injunction, the District Court explained that Kelleher and Jones had failed to demonstrate a likelihood of success on the merits because "[t]hey have not been excluded from the debates because of their viewpoints, but because their candidacies have not generated appreciable public interest"—two considerations specifically identified in *Forbes*. And later, when granting the University System's motion to dismiss the Second Amended Complaint, the District Court again recognized a separate and distinct First Amendment claim in Kelleher and Jones's pleadings and, accordingly, applied *Forbes* to that claim.

¶65 Thus, *at every stage of the proceedings leading up to this appeal, the parties and the District Court all recognized that Kelleher and Jones were pursuing, among other things, a free speech claim under the First Amendment.* (Kelleher and Jones also referenced Montana's counterpart—Article II, Section 7 of the Montana Constitution—in their Second Amended Complaint, but they did not cite any precedents or make any arguments under this provision.) Indeed, the University System maintained during those proceedings that one of the United States Supreme Court's First Amendment precedents—*Forbes*—was "dispositive of the issues raised by Plaintiffs."

¶66 Notwithstanding, a majority of this Court refuses to acknowledge what the District Court and the parties recognized from the outset—that a First Amendment claim was at the heart of Kelleher and Jones's Second Amended Complaint. Indeed, nowhere in the Court's Opinion is there any mention of *Forbes*, and there is only one incidental reference to the First Amendment (*see* Opinion, ¶ 34). Evidently not wanting to contend

27

with the free speech issues raised and litigated in the lower court, the Court avoids those issues entirely by construing the allegations contained in the Second Amended Complaint in such a way that the Court is then able to dismiss on procedural grounds the claims it divines from those allegations. In other words, the Court distorts the essence of Kelleher and Jones's pleadings and then dismisses its own false construct.

¶67    It is inappropriate, however, for this Court to remake this case, in ways that are contrary to the record before us, so as to facilitate expedient disposal of a case that presents difficult issues raised by litigants who are seen by many as being eccentric and not "mainstream" in their philosophies and views. Regardless of that perception, "the ultimate good desired is better reached by free trade in ideas," and "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22 (1919) (Holmes, J., dissenting). To that end, it is this Court's solemn duty to guard jealously the ability of those running for public office to have their say—regardless of whether the speakers are cookie-cutter partisan candidates or whether we perceive what they have to say as having any particular merit.

¶68    Nevertheless, the Court ignores the First Amendment issues raised in the Second Amended Complaint. Without question, it is convenient to perceive in Kelleher and Jones's allegations only claims of "political discrimination" and "conspiracy," Opinion, ¶¶ 27, 30, and then to dismiss those claims because Kelleher and Jones were not employed by the University System, Opinion, ¶¶ 34-36, because they failed to satisfy the exhaustion requirement of § 49-2-509(7), MCA, Opinion, ¶¶ 38-39, and because they

28

omitted factual allegations that are material and necessary to their supposed conspiracy claim, Opinion, ¶¶ 45-46. However, this rendering of the Second Amended Complaint can only be achieved through hypertechnical and highly selective reading that ignores Kelleher and Jones's unmistakable assertion that they are being unconstitutionally excluded from participating in public debates being held on State-owned property.

¶69 Neither the District Court nor the University System, as noted above, was blind to the free speech claim that is apparent on the face of the Second Amended Complaint to even the most undiscerning of readers. Apparently preferring the absurd to the reasonable, this Court, regrettably, flouts the longstanding rule that "[i]t is always to be presumed that no absurd or unreasonable result was intended by the complainant," *Hidden Hollow Ranch*, 146 Mont. at 326, 406 P.2d at 367-68.

¶70 The Court does, at one point, evince cognizance of the fact that Kelleher and Jones raised a First Amendment claim. *See* Opinion, ¶ 24 ("The District Court's order analyzed briefly whether the gubernatorial debates were public forums."). But the Court then relies on its own misstatement of the proceedings below to avoid dealing with that claim. Specifically, the Court contends that we cannot address whether the gubernatorial debates were public fora because this issue "only arose . . . in the context of [Kelleher and Jones's] request for injunctive relief" and Kelleher and Jones did not appeal the District Court's October 4, 2004 order denying that request. Opinion, ¶ 24. The record before us, however, shows this contention to be erroneous.

¶71 In its brief in support of its motion to dismiss the Second Amended Complaint, filed October 25, 2004, the University System's first argument was that "Kelleher and

29

Jones have no constitutional right to appear and speak at the gubernatorial debates that are at issue *since the debates were a non-public forum*" (emphasis added). The University System further asserted that "[t]he case here is factually similar to *Forbes*" and that the exclusion of Kelleher and Jones was "reasonable" and not based on their viewpoints. Next, in their brief opposing the motion to dismiss, filed November 29, 2004, Kelleher and Jones again relied on *Forbes* "as authority that state supported TV coverage of a 'live-audience' general election debate of political candidates is a 'public forum' to which all candidates must be admitted." Finally, in its reply brief in support of its motion to dismiss, filed December 14, 2004, the University System asserted that "the holding [of *Forbes*] resolves the primary issue in this case" and that "the debates at issue were non-public forums."

¶72 The University System and Kelleher and Jones—as well as then-defendants Attorney General Mike McGrath, Secretary of State Bob Brown, and Commissioner of Political Practices Linda Vaughey—all perceived a First Amendment claim that had outlived the District Court's October 4, 2004 order. How is it, then, that the issue of whether the gubernatorial debates were public fora "only arose" in the context of Kelleher and Jones's request for a preliminary injunction and was disposed of, in its entirety, by the October 4, 2004 order (Opinion, ¶¶ 6, 11, 24)? It is truly remarkable that the University System, Kelleher and Jones, the Attorney General, the Secretary of State, and the Commissioner of Political Practices all briefed an issue that, according to a majority of this Court, had already been fully resolved.

30

¶73     Even the District Court was unaware that the public fora issue, apparently, was no longer before the court. Still perceiving a First Amendment claim (among other causes of action) in Kelleher and Jones's Second Amended Complaint, the court analyzed that claim in its December 21, 2004 order granting the University System's motion to dismiss—and the court did so more than just "briefly," contrary to this Court's statement in ¶ 24. Specifically, the court noted that Kelleher and Jones insisted that the gubernatorial debates were public fora, while the University System's position was that "[t]his case is factually similar [to *Forbes*] in that the sponsors of the debate did not have an open-microphone format and did not open the debate to all candidates, but only those to whom they extended an invitation. Therefore, the plaintiffs had no right to appear or speak." The court agreed with the University System's argument, explaining that under *Forbes* the debates were not public fora and that Kelleher and Jones, therefore, were not entitled to relief on this claim. Certainly the District Court would not have engaged in such an analysis—"brief" or otherwise—had it actually disposed of the free speech and public forum issues, in their entirety, in its October 4, 2004 order as this Court contends.

¶74     Given that no one involved in this case up until this Court's decision here has ever maintained that Kelleher and Jones did not raise a First Amendment claim in their pleadings or that this claim did not outlive the District Court's October 4, 2004 order, the unfortunate conclusion is that the misguided party is the majority of this Court rendering today's decision. The majority acknowledges the rules that "[w]e construe the complaint in the light most favorable to the plaintiffs" and that "[a] court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can

31

prove no set of facts in support of his claim that would entitle him to relief." Opinion,

¶ 15. But the majority then performs a remarkable job of plastic surgery upon the face of

Kelleher and Jones's Second Amended Complaint so as to avoid the logical

consequences of these rules. As Justice Sandra Day O'Connor observed in a similar

context:

> "[W]e understand as well as the next court how to . . . articulate the correct
> legal principle, and then perversely fit into that principle a set of facts to
> which the principle obviously does not apply. [All judges] know how to
> mouth the correct legal rules with ironic solemnity while avoiding those
> rules' logical consequences."

*TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 500, 113 S.Ct. 2711,

2742 (1993) (O'Connor, J., dissenting) (alterations and ellipsis in original) (quoting

*Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 907 (W.Va. 1991)). This Court

demonstrates its adeptness at doing so in the case at hand.

¶75    The actual record before this Court establishes that the crux of Kelleher and

Jones's Second Amended Complaint is a First Amendment free speech claim which the

District Court considered in its December 21, 2004 order granting the University

System's Rule 12(b)(6) motion to dismiss. Rather than simply remaking this record, it is

necessary to consider whether that claim is cognizable—i.e., a claim upon which relief

can be granted.

¶76    As explained below, the gubernatorial debates were nonpublic fora under *Forbes*.

As such, to be consistent with the First Amendment, the exclusion of Kelleher and Jones

from the debates must not have been based on their viewpoints and, furthermore, must

otherwise have been reasonable. Given these requirements, and because a complaint

32

should not be dismissed pursuant to a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief," Opinion, ¶ 15; *accord Reidelbach v. Burlington Northern Ry. Co.*, 2002 MT 289, ¶ 14, 312 Mont. 498, ¶ 14, 60 P.3d 418, ¶ 14, Kelleher and Jones stated a cognizable First Amendment claim and the District Court erred in dismissing that claim.

### B. The Public Forum Doctrine

¶77 The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This protection is binding on the States by virtue of the Fourteenth Amendment. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683 (1963).

¶78 Where the government seeks to place restrictions on the use of its property for speech purposes—in other words, "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license"—the United States Supreme Court has adopted a "forum based" approach for assessing the constitutionality of the restrictions. *International Soc. for Krishna Consciousness, Inc. v. Lee* (hereinafter, "*ISKCON*"), 505 U.S. 672, 678, 112 S.Ct. 2701, 2705 (1992); *see also Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954 (1983) (stating that "the standard by which limitations upon [a right of access to public property] must be evaluated differ depending on the character of the property at issue"). Pursuant to this approach, a court presented with a First Amendment challenge first identifies the forum at issue and the category into which

33

the forum fits and then subjects the restriction at issue to the corresponding level of scrutiny.

¶79 The Supreme Court has recognized three categories of fora: the traditional public forum, the designated public forum (also referred to as the limited public forum), and the nonpublic forum. *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641; *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 813, 105 S.Ct. 3439, 3455 (1985) (Blackmun, J., dissenting) (observing that the Court's cases had adopted the term "limited public forum" to refer to a public forum created by government designation); *see also United Food & Commercial v. City of Sidney*, 364 F.3d 738, 750 & n.3 (6th Cir. 2004) (noting "the confusion" and " 'analytical ambiguity' " that has developed surrounding the use of the terms "designated public forum" and "limited public forum").

¶80 "Traditional public fora are defined by the objective characteristics of the property, such as whether, by long tradition or by government fiat, the property has been devoted to assembly and debate." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641 (internal quotation marks omitted). The examples of traditional public fora most often cited are streets, parks, and town squares, "which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Ed. Assn.*, 460 U.S. at 45, 103 S.Ct. at 954-55 (internal quotation marks omitted). "The objective characteristics of these properties require the government to accommodate private speakers." *Forbes*, 523 U.S. at 678, 118 S.Ct. at 1641. Thus, the government can exclude a speaker from a traditional public forum "only when the exclusion is necessary

34

to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641 (internal quotation marks omitted).

¶81 While traditional public fora are open for expressive activity "regardless of the government's intent," *Forbes*, 523 U.S. at 678, 118 S.Ct. at 1641, designated public fora are created by "purposeful governmental action," *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641; in other words, the government "intentionally" opens a nontraditional public forum for public discourse by the general public or by a particular class of speakers, *Forbes*, 523 U.S. at 677, 678, 118 S.Ct. at 1641 (internal quotation marks omitted). To ascertain whether the government "intended to designate a place not traditionally open to assembly and debate as a public forum," a court examines "the policy and practice of the government" or "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny," the same level of scrutiny applicable to traditional public fora. *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641; *see also Perry Ed. Assn.*, 460 U.S. at 45-46, 103 S.Ct. at 955; *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. The exclusion must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that interest." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641 (internal quotation marks omitted).

¶82 Lastly, all other government properties "are either nonpublic fora or not fora at all." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641. Limitations on expressive activity conducted on these properties "must survive only a much more limited review."

35

*ISKCON*, 505 U.S. at 679, 112 S.Ct. at 2705.  Specifically, the government can restrict access to a nonpublic forum as long as the restrictions are reasonable and viewpoint neutral (i.e., "[are] not an effort to suppress expression merely because public officials oppose the speaker's view").  *Forbes*, 523 U.S. at 677-78, 118 S.Ct. at 1641 (alteration in original, internal quotation marks omitted).

### C.    The *Forbes* Decision

¶83    The parties cite *Forbes* as support for their respective arguments on Kelleher and Jones's First Amendment claim.  Indeed, as noted earlier, the University System asserted in the District Court that *Forbes* "is dispositive of" and "resolves" the First Amendment issues in this case.  And on appeal, the University System points out, correctly, that the case at hand is "factually similar to *Forbes*."  As such, it is useful as a preliminary matter to analyze the *Forbes* decision in some detail.

¶84    In *Forbes*, the Arkansas Educational Television Commission ("AETC")—a state agency owning and operating a network of five noncommercial television stations—organized a series of debates between candidates for federal office in the November 1992 elections.  Working in close consultation with the Arkansas Bureau Chief for the Associated Press, AETC staff developed a debate format allowing about 53 minutes during each 1-hour debate for questions to and answers by the candidates.  *Forbes*, 523 U.S. at 669-70, 118 S.Ct. at 1637.  Given this time constraint, AETC staff and the Bureau Chief decided to limit participation in the debates "to the major party candidates or any other candidate who had strong popular support."  *Forbes*, 523 U.S. at 670, 118 S.Ct. at 1637 (internal quotation marks omitted).

36

¶85    Forbes, who had been certified as an independent candidate qualified to appear on the ballot for Arkansas' Third Congressional District, submitted a written request for permission to participate in the AETC debate for that seat.  Consistent with its decision to limit participation in the debates, the AETC denied his request, explaining that "AETC had 'made a bona fide journalistic judgement that our viewers would best be served by limiting the debate' to the [Republican and Democratic] candidates already invited." *Forbes*, 523 U.S. at 670-71, 118 S.Ct. at 1638.  Forbes filed suit against AETC, seeking injunctive and declaratory relief as well as damages.  The District Court found as a matter of law that the debate was a nonpublic forum, and a jury found that AETC's decision to exclude Forbes "had not been influenced by political pressure or disagreement with his views."  *Forbes*, 523 U.S. at 671-72, 118 S.Ct. at 1638.  The Court of Appeals for the Eighth Circuit, however, reversed, and AETC appealed to the Supreme Court.  *See Forbes*, 523 U.S. at 672, 118 S.Ct. at 1638.

¶86    In the Supreme Court, Forbes maintained that the debate was a public forum to which he had a First Amendment right of access.  Applying the public forum doctrine, the Court first determined that the forum at issue was AETC's candidate debate.  *See Forbes*, 523 U.S. at 675-76, 118 S.Ct. at 1640-41.  The Court then categorized the debate, which the parties had already agreed was not a traditional public forum.  After stating the principle that "the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it," *Forbes*, 523 U.S.

at 679, 118 S.Ct. at 1642 (internal quotation marks and citation omitted), the Court

reasoned as follows:

> AETC reserved eligibility for participation in the debate to candidates for
> the Third Congressional District seat (as opposed to some other seat). At
> that point, . . . AETC made candidate-by-candidate determinations as to
> which of the eligible candidates would participate in the debate. Such
> selective access, unsupported by evidence of a purposeful designation for
> public use, does not create a public forum. Thus the debate was a
> nonpublic forum.

*Forbes*, 523 U.S. at 680, 118 S.Ct. at 1642-43 (internal quotation marks and citation

omitted).

¶87     Having determined that the AETC candidate debate was a nonpublic forum, the

Court applied the "much more limited review," *ISKCON*, 505 U.S. at 679, 112 S.Ct. at

2705, applicable to this type of forum. Specifically, "[t]o be consistent with the First

Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the

speaker's viewpoint and must otherwise be reasonable in light of the purpose of the

property." *Forbes*, 523 U.S. at 682, 118 S.Ct. at 1643. The jury had found that "Forbes'

exclusion was not based on 'objections or opposition to his views' "; and, based on

"ample support for this finding" in the record, the Court agreed. *Forbes*, 523 U.S. at 682,

118 S.Ct. at 1643. Observing that Forbes "had generated no appreciable public interest,"

*Forbes*, 523 U.S. at 682, 118 S.Ct. at 1644, the Court concluded that "[h]is own objective

lack of support, not his platform, was the criterion" by which he was excluded. *Forbes*,

523 U.S. at 683, 118 S.Ct. at 1644. Furthermore, "[t]he evidence provided powerful

support for the jury's express finding that AETC's exclusion of Forbes was not the result

of 'political pressure from anyone inside or outside [AETC].' " *Forbes*, 523 U.S. at 683,

118 S.Ct. at 1644 (alteration in original). Accordingly, AETC's decision to exclude Forbes "was a reasonable, viewpoint-neutral exercise of journalistic discretion consistent with the First Amendment." *Forbes*, 523 U.S. at 683, 118 S.Ct. at 1644.

> **D. Application of *Forbes* to the University System's Gubernatorial Candidate Debates**

> **i. Identification and Categorization of the Forum**

¶88 It is necessary first to identify the forum at issue. In this regard, the Supreme Court has rejected the notion that a First Amendment forum "necessarily consists of tangible government property." *Cornelius*, 473 U.S. at 800-01, 105 S.Ct. at 3448.

> Although . . . as an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on *the access sought by the speaker*.

*Cornelius*, 473 U.S. at 801, 105 S.Ct. at 3448 (emphasis added). Thus, in *Cornelius* the Court defined the forum as "an annual charitable fundraising drive," rather than the federal workplace where the drive was conducted. *Cornelius*, 473 U.S. at 790, 801, 105 S.Ct. at 3443, 3448. Similarly, the access sought by Forbes in *Forbes* and by Kelleher and Jones in the present case was not "general access to public property," such as AETC's television airwaves and the University System's campuses, respectively. Rather, it was access to a more limited forum "within the confines of the government property," *Cornelius*, 473 U.S. at 801, 105 S.Ct. at 3448—specifically, the candidate debates hosted by AETC and the University System, respectively. Thus, the relevant forum here is the gubernatorial debates.

39

¶89 Having identified the forum at issue, the next question is whether it is traditional public, designated public, or nonpublic. *See Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. In its December 21, 2004 order, the District Court addressed this issue as follows:

> The plaintiffs argue that one of the sponsors of the debate, the Montana *Standard* published an article in which the debate was declared a "public" forum. This seems to be proof positive that the forum was a public one - but simply because the newspaper called it a public forum does not mean it was a public forum under *Arkansas Education Television Commission v. Forbes*, (1998), 523 U.S. 666. In the forums sponsored by the Montana *Standard* and held at the universities, there was no open-microphone format- members of the public who wished to have questions answered had to submit questions in writing prior to the debates. In the forums at issue, the debates were not open to all candidates, but only to those who were invited to participate. Such were the facts in *Arkansas Education*, supra. Despite the use of the word "public" in the advertisement for the Butte forum, it was not, in fact, public under *Arkansas Education*, supra.

The District Court's conclusion that the debates were nonpublic fora is correct.

¶90 As noted above, "[a] designated public forum is not created when the government allows *selective access for individual speakers* rather than *general access for a class of speakers*." *Forbes*, 523 U.S. at 679, 118 S.Ct. at 1642 (emphases added).[2] Thus, in

---

[2] The Supreme Court appears to make contrary statements on this issue within the *Forbes* opinion. At one point, the Court states that "[i]f the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641. But further along, the Court states that "the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it." *Forbes*, 523 U.S. at 679, 118 S.Ct. at 1642 (internal quotation marks and citation omitted). Yet, if excluding members of the class of speakers (by denying them permission to use the forum) thereby creates a nonpublic forum per the latter statement, then the scenario identified by the former statement would seem to be an impossibility. *See Cornelius*, 473 U.S. at 825, 105 S.Ct. at 3461 (Blackmun, J., dissenting) ("If the Government does not create a limited public forum unless it intends to provide an 'open forum' for expressive activity, and if the exclusion of some speakers is

40

*Forbes*, because AETC made "candidate-by-candidate determinations as to which of the eligible candidates would participate in the debate," the Supreme Court concluded that the debate was a nonpublic forum. *Forbes*, 523 U.S. at 680, 118 S.Ct. at 1642-43.

¶91    Likewise, in the present case, the University System did not open the debates to all gubernatorial candidates who were qualified to appear on the ballot. Rather, the debate sponsors made candidate-by-candidate determinations as to which of the eligible candidates would be invited to participate in the debates, and they decided not to invite

---

evidence that the Government did not intend to create such a forum, no speaker challenging denial of access will ever be able to prove that the forum is a limited public forum. The very fact that the Government denied access to the speaker indicates that the Government did not intend to provide an open forum for expressive activity, and under the Court's analysis that fact alone would demonstrate that the forum is not a limited public forum.").

Perhaps, then, the distinguishing feature between designated/limited public fora and nonpublic fora is the existence of an all-inclusive requirement of individual permission. If individual permission is not required for access and the government excludes a member of the class, then it is a designated public forum and the exclusion is subject to strict scrutiny, but if individual permission is required of *all* members of the class and the government excludes one of them, then it is a nonpublic forum and the exclusion must be merely reasonable and viewpoint neutral. Whether such a distinction fulfills the values underlying the First Amendment, however, is another matter. *See*, *e.g.*, *ISKCON*, 505 U.S. at 693-94, 112 S.Ct. at 2715 (Kennedy, J., concurring in the judgments) ("Our public forum doctrine ought not to be a jurisprudence of categories rather than ideas or convert what was once an analysis protective of expression into one which grants the government authority to restrict speech by fiat."); *United States v. Kokinda*, 497 U.S. 720, 737-38, 110 S.Ct. 3115, 3125 (1990) (Kennedy, J., concurring in the judgment) ("If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case. While it is proper to weigh the need to maintain the dignity and purpose of a public building or to impose special security requirements, other factors may point to the conclusion that the Government must permit wider access to the forum *than it has otherwise intended*." (emphasis added, citations omitted)).

41

Kelleher and Jones. As such, the inevitable conclusion is that the debates were nonpublic fora.

¶92    Kelleher and Jones, relying on *Forbes* and *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269 (1981), assert to the contrary that "Tech, U of M and MSU [are] 'designated public fora' " from which the University System could not exclude them "absent a compelling state interest."   They distinguish the Supreme Court's determination in *Forbes* that the AETC debate was a nonpublic forum on the ground that AETC was a noncommercial television broadcaster, whereas the state actor in the case at hand is a university system.   In other words, they read *Forbes* as applying only to "the media – print or electronic such as cozy TV studios – not commodious university auditoria."

¶93    Yet, the Supreme Court's conclusion that the AETC debate was a nonpublic forum did not depend on the fact that AETC was a television broadcaster (as opposed to some other type of state actor).   Rather, it was AETC's *intent* that informed the Court's decision.   As explained above, the government creates a designated public forum "only by *intentionally* opening a nontraditional public forum for public discourse." *Forbes*, 523 U.S. at 677, 118 S.Ct. at 1641 (emphasis added, internal quotation marks omitted); *see also Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2nd Cir. 2004) ("Governmental intent is the 'touchstone of forum analysis' for determining whether property is a limited public or nonpublic forum." (citation omitted)).   As such, Kelleher and Jones's focus on the objective characteristics of the fora at issue here and in *Forbes* reflects a misreading of the Supreme Court's definition of a designated public forum.

¶94 Kelleher and Jones's reliance on *Widmar* is also misplaced. It is true that "the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar*, 454 U.S. at 268-69, 102 S.Ct. at 274. Indeed, as the Supreme Court observed in *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 115 S.Ct. 2510 (1995),

> in the University setting, . . . the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition. In ancient Athens, and, as Europe entered into a new period of intellectual awakening, in places like Bologna, Oxford, and Paris, universities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn. The quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment. For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses.

*Rosenberger*, 515 U.S. at 835-36, 115 S.Ct. at 2520 (citations omitted).

¶95 This is not to say, however, that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for unlimited expressive purposes. *Perry Ed. Assn.*, 460 U.S. at 44, 103 S.Ct. at 954. The *Widmar* majority specifically noted that the Court has "not held . . . that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." *Widmar*, 454 U.S. at 268 n.5, 102 S.Ct. at 273 n.5; *see also Goulart v. Meadows*, 345 F.3d 239, 253 (4th Cir. 2003) ("The Supreme Court has repeatedly held that distinctions based on the *status* of the speaker can be a permissible way to limit the scope of the forum."). While "the

43

campus of a public university, at least for its students, possesses many of the characteristics of a public forum," "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar*, 454 U.S. at 267-68 n.5, 102 S.Ct. at 273 n.5. For this reason, the debates were not public fora to which Kelleher and Jones had an unqualified right of access simply because they were held on university campuses.

¶96     In sum, the gubernatorial debates at issue here were nonpublic fora under *Forbes*, given that the University System reserved eligibility for participation in the debates to Montana's gubernatorial candidates and then made candidate-by-candidate determinations as to which of the eligible candidates would be invited to participate. *See Forbes*, 523 U.S. at 680, 118 S.Ct. at 1642-43.

### ii.     Scrutiny under the Applicable Standard

¶97     Having determined that the gubernatorial debates were nonpublic fora, the District Court dismissed the Second Amended Complaint. This was error. Identifying the forum at issue and the category into which the forum falls is only half the inquiry:

> The debate's status as a nonpublic forum . . . did not give AETC unfettered power to exclude any candidate it wished. As Justice O'Connor has observed, nonpublic forum status "does not mean that the government can restrict speech in whatever way it likes." *ISKCON*, 505 U.S., at 687, 112 S.Ct., at 2712. To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property. *Cornelius*, 473 U.S., at 800, 105 S.Ct., at 3447-48.

44

*Forbes*, 523 U.S. at 682, 118 S.Ct. at 1643.

¶98    Likewise, in the case at hand, the fact that the debates were nonpublic fora did not give the University System unfettered power to exclude any candidate it wished.   In deciding the University System's Rule 12(b)(6) motion to dismiss, therefore, the dispositive question was whether Kelleher and Jones had alleged that their exclusions from the debates were based on their viewpoints or were unreasonable in light of the purpose of the candidate debates.

¶99    Viewpoint discrimination is "an egregious form of content discrimination" where "the government targets not subject matter, but particular views taken by speakers on a subject."   *Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516.   "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828, 115 S.Ct. at 2516.   Reasonableness, in turn, depends on whether the exclusion of the speaker is "consistent with . . . preserv[ing] the property . . . for the use to which it is lawfully dedicated."   *Perry Ed. Assn.*, 460 U.S. at 50-51, 103 S.Ct. at 958 (alteration and second ellipsis in original, internal quotation marks omitted); *see also Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3453 ("The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances.").   Administrative manageability, the existence or nonexistence of alternative means of contact with the particular audience, and avoiding disruptions in the normal use of the property are all relevant factors in the reasonableness inquiry.   *See Cornelius*, 473 U.S. at 808-11, 105 S.Ct. at 3452-53.   Although the government need not choose the least restrictive

45

alternative when regulating speech in a nonpublic forum, "its failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 967 (9th Cir. 2002) (internal quotation marks omitted).

¶100 In their Second Amended Complaint, Kelleher and Jones allege—albeit, not concisely—that their exclusion from the debates was neither reasonable nor viewpoint neutral. In particular, they claim that the debate organizers discriminated against them in the selection process based on their political ideas, that the organizers have decided to present only the Democratic candidate's and the Republican candidate's thoughts and opinions on how to solve the problems facing Montanans, and that the debates can accommodate all four gubernatorial candidates. In addition, the gist of the Second Amended Complaint can fairly be read as alleging the exercise of unfettered decision-making by the debate organizers.

¶101 The University System asserts to the contrary that the Second Amended Complaint "does not allege that candidates Kelleher and Jones were excluded from the debates based on their viewpoints." This assertion, however, is unsustainable to say the least, in light of our liberal pleading rules and our standards for reviewing a complaint in the context of a motion to dismiss. Plaintiffs are generally not subject to any technical pleading requirements. *Zempel v. Liberty*, 2006 MT 220, ¶ 17, 333 Mont. 417, ¶ 17, 143 P.3d 123, ¶ 17. Rather, a complaint must only put the defendant on notice of the facts the plaintiff intends to prove. *Zempel*, ¶ 16. Furthermore, as stated in ¶ 15 of the Court's Opinion, "[w]e construe the complaint in the light most favorable to the plaintiffs when

46

reviewing an order dismissing a complaint under Rule 12(b)(6)" and "[a] court should not dismiss a complaint for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief" (emphasis added). Finally, and most importantly, we "look to the claim as a whole, to the subject with which it deals, to the reason and spirit of the allegations in ascertaining its real purpose. If such purpose can reasonably be said to be within the scope of the language used, that purpose should be honored." *School Trust v. State ex rel. Bd. of Com'rs*, 1999 MT 263, ¶ 29, 296 Mont. 402, ¶ 29, 989 P.2d 800, ¶ 29 (internal quotation marks omitted). "It is always to be presumed that no absurd or unreasonable result was intended by the complainant." *Hidden Hollow Ranch v. Collins*, 146 Mont. 321, 326, 406 P.2d 365, 367-68 (1965).

¶102 Given these standards, the University System's assessment of the Second Amended Complaint must be rejected. Construing the complaint in the light most favorable to Kelleher and Jones, it simply cannot be said, "beyond doubt," that they "can prove no set of facts in support of [their] claim that would entitle [them] to relief." To the contrary, looking at the complaint as a whole and at the "spirit" of Kelleher and Jones's allegations, and keeping in mind the presumption that they did not intend an absurd or unreasonable result, Kelleher and Jones unquestionably alleged that their exclusions from the debates were not viewpoint neutral and otherwise reasonable as required by *Forbes*. Accordingly, the District Court erred in dismissing the Second Amended Complaint, pursuant to the University System's Rule 12(b)(6) motion, for

failing to state a claim upon which relief can be granted. I therefore would reverse the District Court's judgment and remand this case for further proceedings.

### III. The University System's Motion to Dismiss Treated as a Motion for Summary Judgment

#### A. The District Court's Consideration of Matters outside the Pleadings

¶103 As noted above, the District Court, after determining in its December 21, 2004 order that the gubernatorial debates were nonpublic fora, dismissed Kelleher and Jones's Second Amended Complaint without addressing the separate question of whether Kelleher and Jones had alleged that their exclusions from the debates were based on their viewpoints or were unreasonable in light of the purpose of the debates. Given this omission, the University System directs our attention to the District Court's October 4, 2004 order denying Kelleher and Jones's request for a preliminary injunction, wherein the court observed as follows:

> [Kelleher and Jones] have not been excluded from the debates because of their viewpoints, but because their candidacies have not generated appreciable public interest. Those sponsoring the debates made the decision to invite the two major candidates, both because they are the most viable candidates and because, in their opinion, a debate between the two major candidates will most benefit the general voting public.

The University System suggests that these observations by the District Court support its December 21, 2004 order granting the University System's motion to dismiss.

¶104 Yet, the foregoing observations are based on testimony from the September 28, 2004 hearing on Kelleher and Jones's request for a preliminary injunction. Thus, the University System is suggesting the plausible possibility that the District Court considered matters outside the pleadings when it decided the University System's motion

48

to dismiss. To be sure, it is not clear from the record before us whether the District Court simply overlooked the reasonableness and viewpoint neutrality issues or, instead, intended the observations made in its October 4, 2004 order to act as proxy. However, to the extent the court's December 21, 2004 order granting the University System's motion to dismiss is based on testimony from the September 28, 2004 hearing, the court treated the University System's motion as one for summary judgment. *See* M. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."). It is necessary, therefore, to provide a corresponding analysis of whether there are any genuine issues of material fact precluding summary judgment in favor of the University System (*see* M. R. Civ. P. 56(c)).

¶105 Before doing so, I note this Court's statement in ¶ 16 that this Dissent "surmises" that the District Court may have considered testimony from the September 28, 2004 hearing and that this Dissent "fails to cite to any statement or reference in the District Court's order of October 4, 2004, . . . that would support its conjecture." The issue, however, is not whether the *October 4, 2004* order denying Kelleher and Jones's request for a preliminary injunction was based on matters outside the pleadings (obviously, it was). Rather, the issue is whether the *December 21, 2004* order granting the University System's motion to dismiss was based on matters outside the pleadings (in particular, testimony from the September 28, 2004 hearing).

49

¶106 In this regard, the source of the "surmise" and "conjecture" is the University System's brief on appeal; the Court has simply misattributed it to this Dissent. Moreover, the University System's "surmise" and "conjecture" are hardly unexpected here. After determining, correctly, that the gubernatorial debates were nonpublic fora, the District Court was required under *Forbes* to determine whether Kelleher and Jones had alleged that their exclusions from the debates were unreasonable or viewpoint discriminatory; however, the court did not address this issue in its December 21, 2004 order. It is not surprising, therefore, that the University System relies on the District Court's October 4, 2004 order, which contains the court's only statements on this issue.

¶107 In any event, this Dissent does not rest on any such "surmise" and "conjecture." As explained in Part II above, the District Court erred in concluding under Rule 12(b)(6) that Kelleher and Jones had failed to state a claim upon which relief can be granted. The point of the ensuing discussion is merely to explain why the District Court, to the extent it treated the University System's motion as one for summary judgment under Rule 56, erred in concluding that no genuine issues of material fact exist in this case.

**B. Whether Genuine Issues of Material Fact Exist in this Case**

¶108 Our review of a district court's ruling on a motion for summary judgment is de novo. *Cole v. Valley Ice Garden, L.L.C.*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. We determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). Because summary judgment is an extreme remedy

50

that should not be a substitute for a trial on the merits if a controversy exists as to a material fact, "the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment." *Prindel v. Ravalli County*, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19 (internal quotation marks omitted); *In re Dorothy W. Stevens Revocable Trust*, 2005 MT 106, ¶ 13, 327 Mont. 39, ¶ 13, 112 P.3d 972, ¶ 13.

¶109 Because the gubernatorial debates at issue here were nonpublic fora under *Forbes*, the exclusions of Kelleher and Jones, to be consistent with the First Amendment, had to be reasonable and not based on their viewpoints. *Forbes*, 523 U.S. at 682, 118 S.Ct. at 1643. Again, viewpoint discrimination is "an egregious form of content discrimination" where "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516. Reasonableness, in turn, depends on whether the exclusion of the speaker is "consistent with . . . preserv[ing] the property . . . for the use to which it is lawfully dedicated." *Perry Ed. Assn.*, 460 U.S. at 50-51, 103 S.Ct. at 958 (alteration and second ellipsis in original, internal quotation marks omitted). Administrative manageability, the existence or nonexistence of alternative means of contact with the particular audience, and avoiding disruptions in the normal use of the property are all relevant factors in the reasonableness inquiry. *See Cornelius*, 473 U.S. at 808-11, 105 S.Ct. at 3452-53.

¶110 At this juncture, it is appropriate to set forth the relevant testimony from the September 28, 2004 hearing on Kelleher and Jones's request for a preliminary injunction.

The District Court heard testimony from Kelleher as well as two witnesses who had been involved in organizing the MSU and UM debates.

¶111 On direct examination, Bill Johnston, the UM representative, testified as follows:

> Q.     . . . How did the parties work together to plan this particular debate?
> A.     We discussed the two previous debates.  Initially the first debate I worked on [in 1996] we had the candidates, Marc Racicot and Dorothy Bradley.  And I don't recall a third-party candidate that election cycle.  And the debate, in our opinion, ran smoothly.
> We only have about an hour because it is scheduled in with homecoming activities.  So we have a lot of people on campus, a lot of activities.  So we devote about an hour to the debate and some time for reception.
> That year it seemed to work well, ran well.
> . . . .
> Four years ago it was with Candidate O'Keefe and Governor Martz.  And that year there was a third-party Libertarian candidate, who was invited.  And I think most evaluations showed that the format did not run as well because it just took longer with three candidates and people felt that the third person didn't add a lot to the debate.
> . . . .
> Q.     Okay.  And so tell us about the process by which you determined who would be invited to this particular debate this year.
> A.     . . . .
> We looked at the numbers, and I believe 98 percent of the votes last election went to the primary party.  And I believe about 1.5 or 1.6 of the percent vote went to the third-party candidate.  So with that small number and with the polls we currently had available and looked at in terms of the current candidates, we felt that the majority of registered voters when polled said they were trying to decide between the two primary candidates.
> . . . .
> Q.     Let me see if I got this straight.  You looked at figures that showed that in the last election 98 percent of the vote went to the primary candidates?
> A.     Yes.
> Q.     Either the Republican or the Democratic candidate?
> A.     Yes.
> Q.     And that 1.5 or 1.6 percent of the vote, something like that, went to the third-party candidate?
> A.     That's my memory of the events, yes.

. . . .

Q. What decision then was ultimately made?

A. That we would send a letter of invitation to the two primary candidates, Secretary Bob Brown and Brian Schweitzer.

Q. And your decision was based on, I think you said, polling numbers. Did anything else enter into your decision?

A. It did not.

Q. Did the particular political viewpoints of either of the Green Party candidate or the Libertarian Party candidate enter into the discussion?

A. No, ma'am.

Q. Did any other political factors enter into the decision?

A. Political factors, no. We looked simply at the majority of registered voters and their interests.

. . . .

Q. I'm just going to ask you one more question. That is, could you explain to the Court why you think the format of the debate with the inclusion simply of the Republican and Democratic candidates is in the best interests of the constituents, of the sponsors, and of the state of Montana?

A. Certainly. I mentioned the schedule for homecoming. We have two days of meetings and thousands of people back on campus, so there is very little time for any one activity. We have a time set aside from two to three for the debate. That's sandwiched in between luncheons for distinguished alums and open houses that begin at four, open houses in the academic departments and schools and colleges.

So for the time allowed we have about 65 to maybe 70 minutes for the debate. And it was our decision then to let the two primary candidates that the majority of Montanans seem to be trying to make a decision between the two and trying to give them as much time to articulate their positions as possible.

¶112 On cross-examination of Johnston, counsel for Kelleher and Jones emphasized the "Catch-22" Kelleher and Jones faced as a result of the selection criteria used by the UM debate organizers:

Q. Could you tell me the purpose of this debate.

A. The purpose here is to help voters of Montana learn more about the two primary candidates at this point.

Q. And along with that it allows for certain name recognition between the two candidates; is that correct?

A. I assume that would be one of the outcomes, yes, sir.

53

Q.     And if these smaller party candidates are not allowed to participate in the debate, they are not going to have the advantage of having their names in front of the public -- is that correct -- that the other two candidates would have?

A.     I believe that would be correct.

Q.     Okay.  So it's kind of a Catch 22?

A.     It is.

Q.     You are saying that they don't get much in the way of votes. There again, they don't get much in the way of name recognition, either, if they are not allowed to participate in the debate?

A.     I think that I would view that then that this isn't the only opportunity for them to be in front of the press and in front of the public. This one opportunity is not the only one.

¶113  Following Johnston's testimony, Jodie DeLay, the MSU representative, testified

on direct examination as follows:

Q.     . . . So explain for us the planning process and how you came to the decision as to who to invite to the gubernatorial debate.

A.     As has been mentioned, there was a debate on our campus in March that included all eight of the candidates for the position of governor who were running in the primary election.  That was also put together and planned by students.  And they felt that it went very well, but that at this point in time it would suit the students best to have a concentrated dialogue on the two candidates who have an opportunity in this election to become governor.  It was a pretty strong feeling by everybody on the committee that there are only two candidates -- they happen to be primary party candidates -- who have a chance at this election.

Q.     How much time has been allocated for this debate?

A.     One and a half hours.

. . . .

Q.     Okay.  And I think you testified that it was a strong feeling among the committee members that these were the two viable candidates?

A.     Yes.  The primary election results showed that the third-party candidates -- I don't recall the exact percentage, but in the polls right now the combined between the two third-party candidates is coming in at less than 1 percent.  I think one was .3 and one was .5 in the latest polls, and they've stayed fairly close to that level.

. . . .

A.     The students felt that, by inviting all the eight candidates, they heard from everybody once and now they wanted to narrow it down

and be more focused. And it was the agreement of everybody on the committee that that made sense.

Q. Was the decision of the committee in any way affected by the particular viewpoints of these particular political parties or of these particular candidates?

A. Absolutely not.

Q. Was the decision in any way affected by any other political factors?

A. No.

. . . .

Q. I'll just ask you the same last question. Are you confident that the format of the debate at this point serves the constituents of the University and of the -- I mean of the sponsors of the debate?

A. Yes.

¶114 On cross-examination, DeLay provided further insight into the decision to exclude Kelleher and Jones:

Q. To your knowledge, is there any compelling state interest that is achieved by denying Mr. Jones and Mr. Kelleher the right to participate in these debates?

. . . .

A. I think that a person has the responsibility to get their name out in any way that they can and there's a lot of ways to do that besides just a debate and there's time for that that can happen early on so that you can gain momentum in the press and such. I personally don't feel that that has necessarily happened in this case. And, therefore, I feel that it's not in the State's best interest to invite candidates just to have more people to ask questions to.

Notably, DeLay had indicated earlier that the Congressional debate to which third-party candidate Mike Fellows had been invited "went fine."

¶115 Given the foregoing testimony, the University System maintains that "[t]he debate sponsors legitimately determined that candidates Kelleher and Jones lacked sufficient popular support to be included in debates with candidates Schweitzer and Brown." The University System further asserts that "[t]he inclusion of Kelleher and Jones would have

55

'actually undermine[d] the educational value and quality of debates' " (alteration in original) (quoting *Forbes*, 523 U.S. at 681, 118 S.Ct. at 1643). Therefore, the University System concludes, "[t]he exclusion decision was entirely reasonable in light of the purposes of the debates." The flaw underlying this argument, however, is that the justifications proffered by Johnston and DeLay for excluding Kelleher and Jones, while they may *support* findings of viewpoint neutrality and reasonableness, do not *mandate* such findings as a matter of law.

¶116  In *Forbes*, the Supreme Court observed that "the jury found Forbes' exclusion was not based on 'objections or opposition to his views' " and that the record provided "ample support for this finding, demonstrating as well that AETC's decision to exclude him was reasonable." *Forbes*, 523 U.S. at 682, 118 S.Ct. at 1643. In addition, the Court noted that the evidence provided "powerful support for the jury's express finding that AETC's exclusion of Forbes was not the result of 'political pressure from anyone inside or outside [AETC].' " *Forbes*, 523 U.S. at 683, 118 S.Ct. at 1644 (alteration in original). However, the Court did not state—or in any way imply—that the justifications proffered by AETC for excluding Forbes *mandated* findings of viewpoint neutrality and reasonableness. Rather, the Court reviewed the sufficiency of the evidence supporting the jury's findings and concluded that the record provided "ample" and "powerful" support for those findings. *Forbes*, 523 U.S. at 682, 683, 118 S.Ct. at 1643, 1644.

¶117  In the case at hand, by contrast, the issues of viewpoint discrimination and the reasonableness of the exclusions have not been presented to a jury. Thus, the question here is not whether the record provides "ample" and "powerful" support for a jury's

findings of viewpoint neutrality and reasonableness. Rather, the question at this preliminary stage is whether genuine issues of material fact exist as to these issues—i.e., whether these issues should be submitted to a jury. For the reasons which follow, I conclude that the testimony elicited from Johnston and DeLay establishes genuine issues of material fact on the question of whether the exclusions of Kelleher and Jones were reasonable and not based on their viewpoints and that the University System, therefore, is not entitled to summary judgment.

¶118 First, Johnston suggested that three-candidate debates were not practical, testifying that the two-candidate gubernatorial debate in 1996 "ran smoothly" whereas the three-candidate gubernatorial debate in 2000 "did not run as well." Yet, he offered no explanation for the perceived disparity between the 1996 and 2000 debates (e.g., differing time constraints, logistical problems with the 2000 forum), except to say that "people felt that the third person didn't add a lot to the debate." Where the government restricts speech based on its own predetermination that the speaker(s) to be excluded will not "add a lot" to the discussion, there is certainly a question of viewpoint neutrality.

¶119 Second, Johnston testified in detail concerning the limited amount of time available for the 2004 UM debate (which was "sandwiched" between luncheons and open houses) apparently to suggest that, due to time constraints, the forum itself was not compatible with expressive activity by more than two candidates. Yet, the Supreme Court has rejected the premise that a university can "discriminate based on viewpoint if demand for space exceeded its availability," *Rosenberger*, 515 U.S. at 835, 115 S.Ct. at 2519, and there is no reason to believe that this principle does not apply equally to

demand for time. "The government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity." *Rosenberger*, 515 U.S. at 835, 115 S.Ct. at 2519. Indeed, in this context, it is incumbent on the State "to ration or allocate . . . scarce resources on some acceptable neutral principle"; "scarcity [does not] give the State the right to exercise viewpoint discrimination that is otherwise impermissible." *Rosenberger*, 515 U.S. at 835, 115 S.Ct. at 2519-20. Accordingly, excluding Kelleher and Jones based on the time constraints of the debates was an invalid justification.

¶120 Moreover, this justification ignores the pertinent question here: Did the debate organizers consider reasonable alternatives to excluding Kelleher and Jones? *See Sammartano v. First Judicial District Court*, 303 F.3d 959, 967 (9th Cir. 2002) ("[The government's] failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." (internal quotation marks omitted)). It appears from the record that the debate organizers simply settled on the easiest solution: exclude Kelleher and Jones. However, as established by DeLay's acknowledgment that the three-candidate Congressional debate held at MSU "went fine," there is nothing inherently unmanageable about a three-candidate debate—or, for that matter, an eight-candidate debate (e.g., the gubernatorial debate held at MSU in March 2004, which DeLay testified "went very well").

¶121 Third, Johnston explained that in making their decision to exclude Kelleher and Jones, he and the other UM debate organizers "looked at the numbers" and felt that "the majority of registered voters . . . were trying to decide between the two primary candidates." Likewise, DeLay testified that she and the other MSU debate organizers had

58

relied on the candidates' standings in recent polls. In this regard, she noted that whereas Schweitzer and Brown had "actively campaigned," Kelleher and Jones had not established sufficient "momentum in the press and such" (though she did not state how much "momentum" the debate organizers would have considered sufficient for Kelleher and Jones to be included in the MSU debate). However, whether such a criterion is a viewpoint neutral basis for excluding ballot-qualified candidates and is otherwise reasonable in light of the purpose of a candidate debate is doubtful to say the least.

¶122 For one thing, polling numbers often represent voters' usual party affiliations, as opposed to their familiarity with each candidate's position on the issues. But, to the extent a candidate's standing in the polls does, in fact, reflect the popularity of his or her views, his or her exclusion on this basis constitutes exclusion based on his or her viewpoints. Indeed, when the debate organizers excluded Kelleher and Jones by "look[ing] at the numbers," they rested their decisions on the popularity of Kelleher's and Jones's respective positions on the issues. This is precisely what the First Amendment prohibits: governmental exclusion of a speaker based on his or her views. *See Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

¶123 Another fallacy of excluding a candidate based on his or her standing in the polls is that the State "not only puts its stamp of approval on the favored candidates, it also 'curtail[s] access to ideas' by preventing the ideas and information that would be

59

produced through the debating candidates' interaction from coming to light." *Chandler v. Georgia Public Telecommunications Com'n*, 917 F.2d 486, 493-94 (11th Cir. 1990) (Clark, J., dissenting) (alteration in original). Moreover, the inevitable and unfortunate consequence of excluding a candidate based on polling numbers is a skewing of the debate toward mainstream, conventional views and "reduc[ing] diversity and competition in the marketplace of ideas." *Anderson v. Celebrezze*, 460 U.S. 780, 794, 103 S.Ct. 1564, 1573 (1983). Such an outcome is clearly a disservice to the voting public that the debate organizers purport to be serving. As the Supreme Court observed in *Anderson*:

> Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream. In short, the primary values protected by the First Amendment—"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open"—are served when election campaigns are not monopolized by the existing political parties.

*Anderson*, 460 U.S. at 794, 103 S.Ct. at 1573 (citations and footnote omitted); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 251, 77 S.Ct. 1203, 1212 (1957) (Opinion of Warren, C.J.) ("History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society.").

¶124 Nevertheless, the debate organizers found Kelleher's and Jones's respective polling numbers to be an extremely compelling reason for excluding them. In fact, when asked, "Did anything else [besides polling numbers] enter into your decision?" Johnston

60

testified, "It did not." Yet, even a candidate with "small" polling numbers can alter the outcome of an election. For instance, as Justice Stevens observed in *Forbes*:

> Given the fact that the Republican winner in [Arkansas'] Third Congressional District race in 1992 received only 50.22% of the vote and the Democrat received 47.20%, it would have been necessary for Forbes, who had made a strong showing in recent Republican primaries, to divert only a handful of votes from the Republican candidate to cause his defeat. Thus, even though the AETC staff may have correctly concluded that Forbes was "not a serious candidate," their decision to exclude him from the debate may have determined the outcome of the election in the Third District.

*Forbes*, 523 U.S. at 685, 118 S.Ct. at 1645 (Stevens, J., dissenting) (footnote omitted).

¶125 Fourth, DeLay testified that, in her view, "a person has the responsibility to get their name out in any way that they can and there's a lot of ways to do that besides just a debate." Similarly, Johnston testified that "this isn't the only opportunity for [Kelleher and Jones] to be in front of the press and in front of the public. This one opportunity is not the only one." However, neither witness proffered an alternative forum equivalent to a televised debate—and it is doubtful they could have. While there may, in fact, have been other ways for Kelleher and Jones to "get their name[s] out" and other opportunities for them "to be in front of the press and in front of the public," there was only one way for them to argue their respective positions with the other gubernatorial candidates: through the medium of a debate. "A debate serves to inform the public far more effectively than any candidate's lone appearance could, by creating a synergism between the candidates' immediately conflicting positions." *Chandler*, 917 F.2d at 493 (Clark, J., dissenting). Furthermore,

61

in our tradition, candidate debates are of exceptional significance in the electoral process. "[I]t is of particular importance that candidates have the ... opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." Deliberation on the positions and qualifications of candidates is integral to our system of government, and electoral speech may have its most profound and widespread impact when it is disseminated through televised debates.

*Forbes*, 523 U.S. at 675-76, 118 S.Ct. at 1640 (alteration and ellipsis in original, citation omitted).

¶126 The witnesses' testimony at the hearing suggests a lack of appreciation for these principles and the heightened importance of First Amendment protections in the context of candidate debates. "[I]f it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72, 91 S.Ct. 621, 625 (1971) (citation omitted). For these reasons, the witnesses' respective assertions that "there's a lot of ways to [get one's name out] besides just a debate" and that "this isn't the only opportunity for [Kelleher and Jones] to be in front of the press and in front of the public" are wholly unavailing justifications for excluding them. The status of a candidate debate as a unique forum for presenting one's political views to the public should not be trivialized so readily.

¶127 Lastly, DeLay's testimony suggests that the debate organizers simply did not want to hear from Kelleher and Jones again. (Kelleher and Jones had participated in the March

2004 primary debate at MSU.)  Specifically, she stated that "at this point in time it would suit the students best to have a concentrated dialogue on the two candidates who have an opportunity in this election to become governor."  Furthermore, when asked on cross-examination about the inclusion of third-party candidate Mike Fellows in the Congressional debate, DeLay explained as follows:

> A. . . . Our students hadn't heard his view and, therefore, he was included so that he could speak to our students and to any other community members who come to the debate.
> The difference between that debate and this one that we have coming up on October 4th is that the student body has already heard from all of the [gubernatorial] candidates.
> . . . .
> Q. And they are going to hear from the Democratic and the Republican candidates twice; is that correct?
> A. That is correct.  Because they are considered to be the viable candidates for this election.  They have actively campaigned.

(Johnston testified similarly on cross-examination that "[t]he purpose here is to help voters of Montana learn more about the two primary candidates at this point.")  Later in her testimony, DeLay added:  "I feel that it's not in the State's best interest to invite candidates just to have more people to ask questions to."

¶128  Setting aside the fact that the Secretary of State had already certified Kelleher and Jones as viable candidates, the selection process here concededly involved a judgment as to which views the debate organizers were interested in hearing again.  Essentially, the government decided which of the gubernatorial candidates qualified by the Secretary of State to be on the ballot were worthy of the voters' continued attention and excluded the others.  Ironically, while "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum," *Cornelius*, 473 U.S. at 809, 105

63

S.Ct. at 3453, the debate organizers limited speech on the basis of their preference to hear from only the Democratic and the Republican candidates.

¶129   In sum, the justifications proffered by the witnesses for excluding Kelleher and Jones from the gubernatorial debates establish that genuine issues of material fact exist as to whether the exclusions were based on Kelleher's and Jones's respective viewpoints and were otherwise reasonable in light of the purpose of the forum.   Johnston's and DeLay's testimony reveals that, unfortunately, there were no preestablished objective criteria or guidelines by which the debate organizers chose the candidates who would be invited to participate in the debates and excluded the others.   Their decision-making was entirely unfettered.   In this regard, it is significant that all nine Justices in *Forbes* agreed that the government does not have unfettered power to exclude any candidate it wishes. Justice Kennedy, for the six-member majority, observed that "nonpublic forum status 'does not mean that the government can restrict speech in whatever way it likes,' " *Forbes*, 523 U.S. at 682, 118 S.Ct. at 1643, while Justice Stevens, in his dissent, criticized the "nearly limitless discretion" the AETC staff had "to exclude Forbes from the debate based on ad hoc justifications," *Forbes*, 523 U.S. at 686, 118 S.Ct. at 1645 (Stevens, J., joined by Souter and Ginsburg, JJ., dissenting).

¶130   While unlimited access to a candidate debate by all ballot-qualified candidates is not always feasible, "the requirement of neutrality remains; a broadcaster cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views.   Viewpoint discrimination in this context would present not a '[c]alculated ris[k],' but an inevitability of skewing the electoral dialogue." *Forbes*, 523 U.S. at 676, 118

64

S.Ct. at 1640 (alterations in original, citation omitted). Here, while purporting to educate the electorate by cosponsoring gubernatorial debates, the University System simultaneously restricted the information to which the voters would be exposed. Whether it did so in a viewpoint discriminatory or unreasonable manner are questions of fact precluding summary judgment.

¶131 Accordingly, to the extent that the District Court considered matters outside the pleadings when it decided the University System's Rule 12(b)(6) motion to dismiss, it treated that motion as one for summary judgment under Rule 56. Because genuine issues of material fact exist, the court erred by granting the University System's motion and dismissing Kelleher and Jones's Second Amended Complaint. I therefore would reverse the District Court's judgment and remand this case for a trial on the questions of viewpoint neutrality and reasonableness.

## CONCLUSION

¶132 Notwithstanding its recent admonishment that "it is not this Court's job to 'remake' the case presented to the District Court," *Heggem v. Capitol Indemnity Corp.*, 2007 MT 74, ¶ 46, ___ Mont. ____, ¶ 46, ___ P.3d ____, ¶ 46, this Court has, nonetheless, remade the present case. Worse still, the Court has done so in ways that are contrary to the record before us. That record establishes that the crux of Kelleher and Jones's Second Amended Complaint is a First Amendment free speech claim, which the District Court ruled on in its December 21, 2004 order and which, in turn, is now before us on appeal. Rather than simply remaking this record so as to facilitate expedient

65

disposal of this case, it is necessary for us to consider whether Kelleher and Jones's claim is cognizable. I dissent from the Court's failure to do so.

¶133 With respect to the First Amendment claim, the University System reserved eligibility for participation in the gubernatorial debates to Montana's gubernatorial candidates and then made candidate-by-candidate determinations as to which of the eligible candidates would in fact participate. Thus, the debates were nonpublic fora under *Forbes*. As such, the debate organizers' exclusions of Kelleher and Jones had to be reasonable in light of the purpose of the forum and not based on Kelleher's and Jones's respective viewpoints. Accordingly, the dispositive question in deciding the University System's Rule 12(b)(6) motion to dismiss was whether Kelleher and Jones had alleged that their exclusions were viewpoint discriminatory or otherwise unreasonable.

¶134 Given these requirements, and construing the Second Amended Complaint in the light most favorable to Kelleher and Jones as we are required to do, it simply cannot be said, beyond doubt, that they can prove no set of facts in support of their First Amendment claim that would entitle them to relief. To the contrary, looking at the complaint as a whole and at the spirit of their allegations, and keeping in mind the presumption that they did not intend an absurd or unreasonable result, Kelleher and Jones unquestionably alleged that their exclusions from the debates were not viewpoint neutral and otherwise reasonable as required by *Forbes*. Accordingly, the District Court erred in dismissing the Second Amended Complaint, pursuant to the University System's Rule 12(b)(6) motion, for failing to state a claim upon which relief can be granted.

¶135 Furthermore, to the extent the District Court considered matters outside the pleadings—in particular, testimony from the September 28, 2004 hearing—when it decided the University System's motion to dismiss, it treated that motion as one for summary judgment under Rule 56. The question then becomes whether there are any genuine issues as to any material facts. In this regard, the justifications proffered by the debate organizers for excluding Kelleher and Jones from the gubernatorial debates, while they may *support* findings of viewpoint neutrality and reasonableness, do not *mandate* such findings as a matter of law. Indeed, the witnesses' testimony at times supports and at other times contradicts findings of viewpoint neutrality and reasonableness. If nothing else, the testimony reveals that there were no preestablished objective criteria or guidelines by which the debate organizers chose the candidates who would be invited to participate in the debates. Rather, they excluded Kelleher and Jones based on ad hoc justifications pursuant to their limitless discretion. For these reasons, genuine issues of material fact exist in this case, and the District Court erred by dismissing Kelleher and Jones's Second Amended Complaint.

¶136 I would reverse the District Court's judgment and remand for further proceedings. I dissent from this Court's contrary decision.

/S/ JAMES C. NELSON